MARION F. EDWARDS, Judge.
 

 12Pefendant/appellant, Jose L. Castro
 
 (“Castro”)
 

 [1]
 

 ,
 
 appeals his conviction and sentence on a charge of armed robbery of a bank teller in Jefferson Parish. For reasons that follow, we affirm.
 

 Castro was charged by the Jefferson Parish District Attorney with armed robbery with a handgun in violation of La. R.S. 14:64.3. He pled not guilty at arraignment. Castro filed a “Motion to Appoint Sanity Commission to Determine Competency to Stand Trial.” The district court found Castro incompetent to stand trial after conducting a hearing on the motion. Subsequently, a second competency hearing was held, after which the district court found Castro competent to stand trial. In due course, the district court heard and denied defense motions to suppress evidence, statements, and identification. The court also ruled that Castro did not require a Spanish language interpreter.
 

 | ¡¡Castro was tided by a twelve-person jury and found guilty as charged. Castro filed a
 
 -pro
 
 se “Motion for New Trial or In Arrest,” and a counseled “Motion in Post Verdict Judgment of Acquittal, Arrest of Judgment, and Alternatively Motion for New Trial.” The district court denied both motions in two separate rulings. Castro waived sentencing delays, and he was sentenced to serve thirty-three years at hard labor, without benefit of parole, probation, or suspension of sentence.
 

 Castro filed a timely “Motion for Appeal and a Motion to Reconsider Sentence.” The district court granted the appeal motion and denied the motion to reconsider sentence.
 

 FACTS
 

 Susan Guy testified at trial that, on June 18, 2005, she was working as a teller at a branch of Bank One on Clearview in Hara-han, Louisiana. The bank opened that morning at 9:00. A man she identified as Castro entered the lobby and approached her teller station. He pulled out a bag and opened it so that she could see a gun, which appeared to be a revolver. Castro told Ms. Guy he would shoot her, and ordered her to give him money in $100 bills. Castro also told Ms. Guy not to include a “dye pack.” Castro handed Ms. Guy the bag, which no longer held the gun, and she put two $5,000 “straps” from her teller drawer into it. As instructed, she did not add a dye pack. Castro thanked Ms. Guy and left the bank.
 

 When Castro left the bank, Ms. Guy pressed the security button and notified her manager that she had been robbed. Police arrived at the scene, and Ms. Guy gave them a description of the robber. She told officers he was a Hispanic man who stood 5' 6"-5' 7" tall, 140-170 pounds. He had curly hair and a thick mustache. He wore a baseball cap and oversized swe
 
 *1041
 
 atpants. Ms. Guy testified that Castro did not look her in the eye, but she got a look at his face.
 

 |4Ms. Guy identified the evidence introduced by the State, including the bank’s surveillance videotape of the robbery and a photograph of a $5,000 pack of $100 dollar bills, wrapped in Bank One straps taken in the robbery.
 

 Detective Roger Gorumba, a Jefferson Parish homicide detective, testified that he responded to the robbery call at Bank One in the 900 block of Clearview. Officers from the patrol division had already arrived at the scene. One of the officers obtained the bank’s surveillance videotape of the robbery, which was released to the news media.
 

 Raymond Parker, manager of Shrews-bury Manor, located at 203 Shrewsbury Road in Jefferson, testified that he rented rooms by the week and by the month. In June of 2005, Castro was in room 25 in the complex. On the night of June 18, 2005, Mr. Parker saw the surveillance videotape of the Bank One robbery on a television news program. He recognized the man in the videotape as Castro. The next morning, when he saw a photo of the robber in
 
 The Times-Picayune
 
 newspaper of the man who had allegedly robbed Bank One, he recognized the man as The tenant in room 25.
 

 Mr. Parker contacted police with that information, and he identified Castro as the man in the newspaper photo. Mr. Parker told officers he had recently seen Castro with more money than usual. Although another man had lived in the apartment with Castro for a short time, Mr. Parker was certain it was Castro in the photos.
 

 Detective Gorumba verified Mr. Parker’s testimony and further stated that he spoke to additional people at Shrewsbury Manor in order to determine whether anyone else had information about the suspect. He eventually performed a consent search of room 25 at 203 Shrewsbury, and he enlisted the crime scene division to photograph the evidence collected in the search. Among the items recovered in the | ^search were a BB gun and dark colored sweatpants. Detective Gorumba also collected paperwork from the room that bore Castro’s name.
 

 Sergeant Martin Dunn, III testified that he accompanied Detective Gorumba to Shrewsbury to meet with Mr. Parker. He then went to 22 Labarre Place on information that Castro’s girlfriend, Laurie Hughes, lived there. When he arrived, he saw Castro sitting in the passenger seat of a brown Buick. Sergeant Dunn called for a marked backup unit and then asked Castro to step out of the car. Castro complied. Sergeant Dunn advised Castro of his rights, and Castro acknowledged that he understood.
 

 Sergeant Dunn observed while uniformed officers searched Castro. They recovered a roll of money that was still in a bank wrapper from Castro’s pocket. Sergeant Dunn obtained Ms. Hughes’ written consent to search the Buick. However, Sergeant Dunn did not personally search the vehicle. Instead, he went to the robbery scene to assist in the search for the gun used in the crime.
 

 Detective Sergeant Dax Russo of the robbery division testified he was notified when the bank robbery suspect was in custody. He first went to Labarre and directed that the vehicle be towed to the detective bureau of the sheriffs office. He had Castro transported to the detective bureau, where he conducted a tape-recorded interview. Castro first gave his name as Manuel Castro, but he later admitted that was his brother’s name. Castro admitted his real name as Jose L. Castro. A
 
 *1042
 
 transcription of the recorded interview was made, and it was introduced at trial. The tape was played for the jury.
 

 During the interview, Castro admitted he committed the robbery. He said he had lost his wallet, and he was desperate for money to pay his rent and to buy food to eat. Castro said he used a BB gun in the robbery. He used the money he obtained in the robbery to buy food, jewelry, and a telephone. He spent about | ,¡$2,000, and gave his girlfriend about $500. When he was stopped by police on Labarre, he had some of the money on his person.
 

 Sergeant Russo testified that Castro identified himself in the surveillance photograph from the bank. Castro signed the back of the photo and dated it June 19, 2005 at 4:32 p.m.
 

 Sergeant Russo identified several items that were seized in a search of Ms. Hughes’ car, including a Family Dollar shopping bag with merchandise, a Sharper Image shopping bag with merchandise, a T-Mobile cellular telephone with a store receipt, and a Be Be shopping bag containing store merchandise. According to Detective Russo, Castro admitted to buying all of the items found in the car with money from the bank robbery.
 

 Castro testified at trial. He stated that, on June 18, 2005, he was living at 203 Shrewsbury, Apartment 25. He denied having robbed Bank One on June 18, 2005. Castro stated that, on the day of the robbery, he went to a movie, bought food at Wal-Mart, and went fishing in the Mississippi River. On June 19, 2005, he went shopping at a mall with his girlfriend, Laurie. He found shopping money, amounting to between $300 and $600, in a bag.
 

 Castro testified that police coerced his confession. He maintained that police officers asked him if he knew anything about a robbery at Bank One on Clearview. They showed him a photograph and asked if he recognized the person depicted. The man looked like him, but Castro told the officers he did not recognize the photo. Castro testified that he signed the photograph only after officers threatened him.
 

 Castro further testified that police threatened to arrest his girlfriend for driving the getaway car in order to coerce the confession. When he continued to deny involvement in the robbery, Detective Russo hit him hard in the head. The 17officer wanted him to admit to the robbery, and he continued to deny involvement. Finally, the officer was able to coerce him into admitting to the robbery.
 

 Castro said that the BB gun found in his apartment was not his. He opined that the gun belonged to a roommate he had at that time. Castro testified that he did not know where police officers got the money they claimed to have seized from him, but he did not have the money. Castro testified he only had $100-$200 on him at that time of the search.
 

 After hearing all of the testimony and reviewing the documentary evidence and exhibits, the jury returned a verdict of guilty as charged.
 

 LAW AND ANALYSIS
 

 Both defense counsel and Castro have filed briefs in this appeal. Defense counsel assigns one error relating to the exces-siveness of sentence. In his
 
 pro se
 
 brief, Castro assigns twenty-five errors which, for purposes of clarity, we will combine and address in nine discussions and analy-ses.
 

 In the sole error assigned by defense counsel, Castro asserts he received an excessive sentence. Castro argues the trial court abused its discretion in imposing a thirty-three-year sentence for armed robbery. In support of his argument, Castro references an alleged plea arrange
 
 *1043
 
 ment offered by the State prior to trial, under which he would have been sentenced to twenty-five years. He further argues that only a BB gun was used in the commission of the offense. The State responds that defendant’s sentence is not constitutionally excessive; that it is one-third of the maximum penalty for armed robbery; that defendant put several lives in danger by using a firearm to carry out the robbery; and that he showed no remorse for his actions. The State further argues that any plea deals offered to defendant prior to trial have no bearing on the constitutionality of the sentence.
 

 | ^Although defense counsel filed a Motion to Reconsider Sentence in the trial court, he did not state specific grounds for his motion. Counsel simply objected to the sentence as “excessive.” The failure to file a motion to reconsider sentence, or to state the specific grounds upon which the motion is based, limits a defendant to a review of the sentence for constitutional excessiveness.
 
 [2]
 

 A sentence is unconstitutionally excessive when it imposes punishment grossly disproportionate to the severity of the offense or constitutes nothing more than needless infliction of pain and suffering.
 
 [3]
 
 A trial judge has broad discretion when imposing a sentence and a reviewing court may not set a sentence aside absent a manifest abuse of discretion.
 
 [4]
 
 On appellate review of a sentence, the relevant question is not whether another sentence might have been more appropriate but whether the trial court abused its broad sentencing discretion.
 
 [5]
 
 A trial judge is in the best position to consider the aggravating and mitigating circumstances of a particular case, and is, therefore, given broad discretion in sentencing.
 
 [6]
 

 In determining whether the sentencing court abused its discretion, the reviewing court should consider: “1) the nature of the crime, 2) the nature and background of the offender, and 3) the sentence imposed for similar crimes by the same court and other courts.”
 
 [7]
 

 Under La. R.S. 14:64(B), armed robbery is punishable by a sentence of ten to ninety-nine years at hard labor, without benefit of parole, probation, or suspension of sentence. There is little information about Castro’s background in |9the record. At the time of sentencing, the State noticed its intention to file a habitual offender bill of information in this case. This is an indication that Castro has at least one prior felony conviction. While Castro did not discharge his gun in the commission of the robbery, he put the lives of several people in danger by carrying a gun into the bank. Castro argues that he used a BB gun and he was polite, indicating that should be mitigating factors in sentencing. We are not persuaded by Castro’s argument. This Court has found a BB gun can be considered a “dangerous weapon” for purposes of La. R.S. 14:64.
 
 [8]
 
 Further, re
 
 *1044
 
 gardless of whether Castro was “polite” toward Ms. Guy, she testified she felt threatened by him and felt forced to give him the money.
 

 As the State points out, Castro’s sentence is only one-third of the statutory limit for armed robbery. It falls within the acceptable range for armed robbery sentences based on similar facts. We agree.
 

 We do not find Castro’s sentence is constitutionally excessive.
 
 [9]
 
 Consequently, we find no merit in this argument.
 

 In Castro’s first four assignments of error, he argues his confession should have been suppressed because it was coerced by police officers.
 

 Before a confession or inculpa-tory statement made under custodial interrogation can be admitted into evidence, the State has the burden of showing that the accused who made the statement was first advised of his Miranda
 
 [10]
 
 rights and that the statement
 
 was
 
 made freely and voluntarily, and not under the influence of fear, duress, intimidation, menaces, threats, inducements, or promises.
 
 [11]
 
 A ^^determination as to voluntariness is made on a case-by-case basis, with a regard for the facts and circumstances of each case.
 
 [12]
 
 The critical factor in a knowing and intelligent waiver is whether the defendant was able to understand the rights explained to him and voluntarily gave the statement.
 
 [13]
 
 The trial judge’s determination as to the admissibility of the statement is entitled to great weight and will not be overturned unless unsupported by the evidence.
 
 [14]
 
 This Court has stated that a confession is coerced if an individual’s will was overborne or if his confession was not the product of a rational intellect and a free will, whether by physical intimidation or psychological pressure.
 
 [15]
 

 Given the testimony at the motion to suppress hearing and at trial, the trial court was free to accept the testimony of police officers over that of Castro. We find no merit in these assignments of error.
 

 In
 
 pro se
 
 assignments 5, 6, 7, 8, 9, and 10, Castro argues he was deprived of due process because the trial court did not provide him access to a state-funded psychiatric expert to assist him in constructing an insanity defense. Castro specifically refers to a
 
 pro se
 
 “Motion for Expert Funds” he filed in the trial court on October 23, 2008, and a
 
 pro se
 
 “Motion to Appoint the Indigent Defendant With Expert Psychiatrict [sic] Assintence [sic],” filed in the trial court on October 29, 2008. The trial court summarily denied both mo
 
 *1045
 
 tions on November 3, 2008, with a notation that Castro had an attorney of record.
 

 We find the trial court did not abuse its discretion in denying Castro’s requests for funding for an independent psychiatric evaluation. The record shows Castro entered a plea of “not guilty.” There is no indication in the record that I,[Castro attempted to change his plea to “not guilty and not guilty by reason of insanity.” Absent a change of plea to “not guilty and not guilty by reason of insanity,” Castro’s motions for funding for a psychiatric expert were premature.
 
 [16]
 

 Similarly, we do not agree with Castro’s argument that the trial court’s rulings deprived him of his right to due process. Louisiana’s statutory procedure is not constitutionally infirm because it does not afford a criminal defendant the right to have the state pay for an independent psychiatric evaluation.
 
 [17]
 

 As previously discussed, the trial court appointed a sanity commission to determine Castro’s competency to stand trial. Dr. Rafael Salcedo, a forensic psychologist, and Dr. Richard Richoux, a forensic psychiatrist, were appointed. The doctors examined Castro on April 12, 2006. At the competency hearing on April 19, 2006, the parties stipulated that the doctors were experts in the fields of forensic psychology and psychiatry, respectively. The parties also stipulated to the doctors’ report. Based on the doctors’ findings, the trial court found Castro incompetent to stand trial at that time and committed him to the state forensic facility at Jackson.
 

 The doctors re-examined Castro on January 16, 2008. In their report to the court, they noted that, upon his admission to the Eastern Louisiana Mental Health System, Forensic Division, Castro was diagnosed with a non-specific psychotic disorder. But over time, physicians at the hospital determined that Castro was “attempting to malinger nonexistent psychopathology.” Doctors Salcedo and Richoux noted that, when they examined him, Castro “did not display any objective signs or symptoms of psychotic disorder,” The doctors concluded, “At this juncture, we do not believe that Mr. Castro suffers from a bona fide mental | ^disorder which would impair his ability to understand the Bennett criteria for competency to proceed.” The doctors did not comment on Castro’s mental state at the time of the offense.
 

 At the competency hearing on March 5, 2008, the parties again stipulated to the report of Doctors Salcedo and Richoux. The trial court found Castro competent to stand trial.
 

 Castro’s reliance on
 
 Ake v.
 
 Oklahoma,
 
 [18]
 
 as authority for the proposition that he is entitled to an independent psychiatric evaluation, and his contention that the trial court erred in denying funds to obtain such evaluation, is misplaced. In
 
 Ake,
 
 the Louisiana Supreme Court held that an indigent defendant has a due process based right to appointment of a psychiatric expert to present rebuttal evidence at sentencing “when the State presents psychiatric evidence of the defendant’s future dangerousness.”
 
 [19]
 
 The State presented
 
 *1046
 
 no such evidence in this case. We find no merit in these assignments.
 

 Pro se
 
 assignments 11, 12, 13, 14, 15, and 16 are expressed in terms of the improper admission of evidence at trial and present several arguments. First, Castro seems to complain that he was not supplied with the police incident report as required under
 
 State v.
 
 Shropshire.
 
 [20]
 

 Shropshire
 
 provides that a police incident report is a public record that must be produced for the defendant’s examination.
 
 [21]
 
 If defendant wishes to obtain a copy of the police incident report in his case, he may request it under the Public Records Law, La. R.S. 44:31. If an inmate seeking access to public records is not proceeding under the Public Records Law but, instead, seeks a free copy of the district attorney’s file, he must file a motion for production of documents in the district court, and he must demonstrate a | ^particularized need.
 
 [22]
 
 An appeal is not the proper venue in which to seek a copy of the police report.
 

 Castro alleges discrepancies among the various police reports generated in his case. No police reports were entered into evidence at trial. They are not, therefore, before this Court.
 

 Castro also complains that he was denied his constitutional right of confrontation in that State witness Sergeant Dax Russo testified that Deputy Tierney participated in Castro’s arrest, but Deputy Tierney did not testify at trial and was, thus, not available for cross-examination by the defense. Defense counsel raised this issue at the close of the State’s case at trial and moved for a mistrial. The court denied the mistrial. Counsel also raised the issue in a motion for new trial. The trial court denied the new trial motion.
 

 We find the trial court correctly denied both motions. Sergeant Russo did mention Deputy Tierney in his testimony but only to say that he had Deputy Tierney transport Castro from the scene of the arrest to the detective bureau. Sergeant Russo did not testify to anything Deputy Tierney said; thus, there is no issue of hearsay evidence. Further, Castro could have called Deputy Tierney as a witness at trial if he wished to question him.
 

 Castro further complains of some documents regarding Deputy Tierney that were allegedly sealed by the trial court and made unavailable to him. When he raised the issue in the trial court, the judge responded:
 

 I can tell you that I am not aware of my signing an order or ordering that any records on behalf of the State be sealed with regard to Deputy Tyrney [sic] being fired from the Jefferson Parish Sheriffs Office so I’m not aware of that and I’ve asked my clerk to peruse the record and a transcript to find it in there where I ordered that those records be sealed and she could not find it.
 

 | ^Lastly, Castro argues the police lacked probable cause to arrest him without a warrant. Am arrest made without probable cause is illegal and the seizure of evidence pursuant to an illegal arrest is also illegal.
 
 [23]
 
 In this case, the officers had probable cause for the arrest at the time they went to Labarre Place to
 
 *1047
 
 find Castro. Detective Gorumba testified at trial that Raymond Parker positively identified Castro in a photograph taken from the bank’s surveillance videotape. Also, at the suppression hearing, Sergeant Dunn testified that a witness, Larry Hartford, made a positive one-on-one identification of Castro upon seeing him in Ms. Hughes’ car on Labarre Place.
 
 [24]
 
 We find no merit in this assertion.
 

 In
 
 pro se
 
 assignments 17, 18, 19 and 20, Castro complains that the trial court erred in denying his motion to suppress identification. He argues Raymond Parker’s identification of him was impermissibly suggestive, as was Susan Guy’s in-court identification at trial.
 

 The defendant generally bears the burden of proof on a motion to suppress an out-of-court identification.
 
 [25]
 
 In order to suppress an identification, a defendant must first prove that the identification procedure was suggestive.
 
 [26]
 
 Even when the suggestiveness of the identification process is proved by the defendant or presumed by the court, the defendant must also show that there was a substantial likelihood of misidentification as a result of the procedure.
 
 [27]
 
 Fairness is the standard of review for identification procedures, and reliability is the linchpin in determining the admissibility of identification testimony.
 
 [28]
 

 115One of Castro’s specific arguments in regard to his identification relates to the identification made by Mr. Parker after viewing the newspaper photo and news coverage of the robbery. Castro argues Mr. Parker only notified police after seeing the news coverage to receive the $5,000 reward. Castro says the photos and video were not clear enough for a positive identification, and he further questions Mr. Parker’s credibility because he told police Castro lived in the apartment for four months, when, in reality, Castro only lived there for two months.
 

 This Court has held that the viewing of television news coverage of a defendant’s arrest or seeing his picture in a newspaper is not a part of an identification procedure.
 
 [29]
 
 In any case, Mr. Parker’s identification was not initiated by any agency of the State. This was not a photograph lineup set up by an agency of the State which may have prejudiced Castro. Mr. Parker’s sighting of the newspaper article was inadvertent, and he notified the sheriffs office of his own volition.
 
 [30]
 
 We note further that, although Castro questions Mr. Parker’s intent in notifying officers, he does not question the accuracy of Mr. Parker’s identification. Accordingly, we find no merit in this argument.
 

 Castro also takes issue with the in-court identification by Ms. Guy. An in-
 
 *1048
 
 court identification, such as Ms. Guy’s, is not unduly suggestive.
 
 [31]
 
 The mere fact that the defendant was conspicuously seated at the defense table at trial at the time the witness identified him did not suggest that he was guilty of the crime, only that he was charged with its commission.
 
 [32]
 
 Further, Castro had an ample opportunity to | incross-examine the witness. That was sufficient to remedy any suggestiveness inherent in the in-court identification process.
 
 [33]
 

 Upon review, we find no merit in Castro’s arguments relating to his identification. We further note that Castro identified himself in the surveillance video and confessed to the crime.
 

 In
 
 pro se
 
 assignment of error 20, Castro seems to argue that he was deprived of his due process rights when the trial court denied him a court-appointed Spanish language interpreter during the court proceedings.
 

 The Louisiana Supreme Court has held that the appointment of a qualified foreign language interpreter, based on the defendant’s ability to show he is unable to understand the court proceedings in English, is within the sound discretion of the trial court.
 
 [34]
 

 The record shows there were interpreters present during the trial court proceedings on May 19, 2008; July 7, 2008; and August 6, 2008. The trial court supplied a Spanish language interpreter during the August 28, 2008 hearing on Castro’s suppression motions. Defense counsel also had an interpreter appointed by IDB (Indigent Defender Board) at the suppression hearing to facilitate her communication with Castro. At that hearing, Sergeant Russo testified that, during the course of his tape-recorded interview with Castro, Castro never asked to be provided with a Spanish interpreter. Castro was able to communicate clearly in English. Sergeant Russo commented that his department has interpreters, as well as Spanish-language rights forms.
 

 At the conclusion of the suppression hearing, the trial court, on its own motion, conducted an inquiry into whether Castro actually required the services of an interpreter. The court conducted an inspection of the tape recording of Castro’s |17police statement in open court. The judge then gave defense counsel an opportunity to present argument on the matter, and counsel declined. The trial court ruled:
 

 The Court finds, upon the examination of the tape and the testimony of the witness that was before us, but more specifically on the tape, itself, the defendant’s English is far superior than a lot of folk, the manner in which he spoke and his understanding as indicated by the proper responses to the questions is such that the Court finds he does not need an interpreter. And we, therefore, order that the interpreter that has been requested in this case and ordered by the Court, that order is now vacated forthwith.
 

 There was no objection from the defense. However, Castro subsequently filed a
 
 pro se
 
 “Motion to Reconsider Spanish Interpreter,” in which he asked the trial court to reappoint an interpreter because of his “inability to understand the English language well enough.” The trial court summarily denied the motion.
 

 
 *1049
 
 We find numerous examples in the record of Castro’s ability to capably speak, write, and understand the English language. He has written numerous
 
 pro se
 
 filings in the trial court and on appeal. Those filings display a mastery of the English language that is at least equal to that of the average native-born
 
 pro se
 
 defendant. As the trial court noted, Castro spoke competent English during his interview with Sergeant Russo. He also appeared to understand the questions asked of him during his testimony at trial. Additionally, in their January 16, 2008 report to the court, Doctors Salcedo and Richoux stated, “It is interesting to note that Mr. Castro also has a fairly good command of the English language, notwithstanding the fact that he speaks with an accent, and he was noted at the hospital initially to claim not to understand English at all.”
 

 Based on this record, we find no abuse in the trial court’s discretion in denying Castro a Spanish-language interpreter.
 

 Castro’s
 
 pro se
 
 assignment of error 22 asserts that evidence retrieved from his home, specifically pants, a watch, and a gun, were improperly introduced into 118evidence. Castro argues these items were not shown to be related to the crime and, therefore, should have been suppressed.
 

 Generally, all relevant evidence is admissible.
 
 [35]
 
 Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or waste of time.
 
 [36]
 
 Before demonstrative evidence can be admitted at trial, it must be properly authenticated.
 
 [37]
 
 The identification can be visual, through testimony.
 
 [38]
 
 The identification can also be accomplished through chain of custody, by tracing the object from the time it was seized to the time it was offered into evidence.
 
 [39]
 
 It is sufficient if the evidence shows it is more likely than not that the object is one connected with the case.
 
 [40]
 
 A lack of positive identification of demonstrative evidence or its chain of custody goes to the weight of the evidence, not to its admissibility, and the connection of that evidence to the case is a factual matter to be determined by the trier-of-faet.
 
 [41]
 

 Castro objected to the admission of the watch, the BB gun, and the sweatpants prior to the commencement of trial, arguing the State could not sufficiently connect them with the crime. The judge performed an in-camera inspection of the evidence and determined the items were admissible. The judge determined that the identification of the items would go to the weight of the evidence, which was a matter for the jury.
 

 1 ii)Upon review of the trial record, we find the State succeeded in showing it was more likely than not that the BB gun, the sweatpants, and the watch were connected
 
 *1050
 
 to the charged offense. Although Susan Guy testified that the gun Castro used in the robbery resembled a revolver, Castro stated he used a BB gun to rob the bank.
 

 Ms. Guy testified at trial that the perpetrator wore sweatpants at the time of the robbery. Detective Gorumba testified that he recovered the sweatpants at Castro’s apartment. The color surveillance photographs of the robbery clearly show the perpetrator was wearing a watch with a dark band. The photograph of the watch seized from Castro’s apartment shows it had a dark band.
 

 Based on the foregoing, we find no error in the trial court’s decision to admit the evidence. This assignment of error is without merit.
 

 In his pro
 
 se
 
 assignment of error 24, Castro makes an ineffective assistance of counsel claim. In his argument supporting this assignment, Castro first refers to a
 
 pro se
 
 motion to substitute counsel that he filed in the trial court prior to trial, in which he complained that his appointed counsel, Frazilia Wiggins, had been allowed to withdraw from his case due to health issues, and he had been appointed new trial counsel, Letitia Davis. Castro complained that Ms. Davis was ignoring his correspondence, and she was not diligently preparing his case for trial. He asked the trial court to appoint new counsel, and the court denied the motion. However, the record shows that Ms. Wiggins ultimately represented Castro at trial in this case. She also represented him at the pre-trial hearing on his suppression motions. Since Castro seems to have had a problem only with Ms. Davis, and not with Ms. Wiggins, we do not find this argument supports an ineffective assistance of counsel claim for our review.
 

 It is fundamental that a criminal defendant is entitled to effective assistance of counsel under the Sixth Amendment to the United States Constitution and Article I, 12o§ 13 of the Louisiana Constitution. Effective assistance of counsel does not mean errorless counsel, or counsel who may be judged ineffective on mere hindsight.
 
 [42]
 

 To establish ineffective assistance of counsel, a defendant must prove both that 1) his attorney’s performance was deficient, and 2) he was prejudiced by the deficiency.
 
 [43]
 
 An error is prejudicial if it was so serious as to deprive the defendant of a fair trial, or “a trial whose result is reliable.”
 
 [44]
 
 Prejudice is shown when the defendant demonstrates that, but for counsel’s unprofessional conduct, the outcome would have been different.
 
 [45]
 

 Castro further contends that his appellate counsel has been ineffective in that he has been “lax in filing issues in Defendant’s behalf and shows little, if any, interest in actively pursuing this case.” Castro does not detail what issues his appellate counsel could have, but failed to, raise in this Court. While it is true that his appellate counsel raised only one assignment of error in his brief, Castro does not suggest what additional issues counsel
 
 *1051
 
 should have raised. Therefore, Castro fails to show that he was prejudiced thereby.
 

 Based on the foregoing, we do not find that Castro satisfied the two-part
 
 Stride-land,
 
 test. Thus, he has faded to show that either his trial or his appellate counsel has been ineffective. This assignment of error is without merit.
 

 In the final
 
 pro se
 
 assignment of error, Castro asserts that the redacted copy of the
 
 The Times-Picayune
 
 should not have been admitted into evidence. As we understand his argument, Castro complains that the photograph from the
 
 The Times-Picayune
 
 newspaper introduced at trial was improperly redacted to obscure evidence that might have been favorable to his case.
 

 RiThis assignment appears to come from a pre-trial discussion in which the State produced the newspaper photograph at issue and explained to the court that State’s witness, Raymond Parker, had shown officers the photograph when he identified Castro during the investigation of the crime. Mr. Parker signed and dated the photograph to demonstrate that he had made a positive identification. The State planned to use the photograph during Mr. Parker’s testimony at trial to demonstrate to the jury that Mr. Parker had made a positive identification. Since the photo also bore the signature of another person who would not be called as a witness, the trial court suggested that the State “white out” that signature. The State also agreed to distribute photocopies to the jury with the second signature obscured.
 

 Defense counsel objected to the witness, Mr. Parker, being shown the original newspaper photo, and the jury being shown a redacted version. The court noted Castro’s objection, and ordered that the witness would be shown the original newspaper photograph, and that the jurors receive redacted copies.
 

 During his trial testimony, Mr. Parker identified the newspaper photograph of the robbery suspect. He also identified his signature on the photograph, and the time and date he wrote on it at the officers’ request: June 19, 2005 at 8:32 p.m. The court then allowed the prosecutor to distribute redacted photocopies of the newspaper photo to the jurors. The trial court stated that the copies were admitted subject to defense counsel’s objection. When the State made its offer of evidence at the conclusion of its case, it asked that the original photo be admitted for record purposes only and not be published to the jury.
 

 We find no merit in Castro’s contention that the redaction of the second signature from the photo was somehow prejudicial to his case. Further, we find Castro’s argument that the photograph itself was inadmissible hearsay is unfounded. 1¡^Hearsay is defined as a statement, other than one made by the declarant while testifying at the present trial or hearing, offered in evidence to prove the truth of the matter asserted.
 
 [46]
 
 The newspaper photograph was not an out-of-court assertion. Mr. Parker testified at trial, and he identified his signature on the photograph. He was available for cross-examination. Just as information about the course of a police investigation has been found admissible to the prosecutor in drawing a full picture for the jury, Mr. Parker’s identification of the photograph helped to show how police came to identify defendant as a suspect.
 
 [47]
 

 We find no merit in this assignment.
 

 
 *1052
 

 ERRORS PATENT
 

 We have reviewed the record was reviewed for errors patent and find the following.'
 
 [48]
 
 While the commitment reflects that the trial court informed Castro of the two-year prescriptive period for applying for post-conviction relief under La.C.Cr.P. art. 930.8, the sentencing transcript does not show that the court advised Castro of said prescriptive period.
 

 We hereby advise Castro, by this opinion, that no application for post-conviction relief, including applications which seek an out-of-time appeal, shall be considered if it is filed more than two years after the judgment of conviction and sentence has become final under the provisions of La. C.Cr.P. arts. 914 or 922.'
 
 [49]
 

 For the foregoing reasons, we affirm the conviction and sentence.
 

 AFFIRMED.
 

 [1]
 

 . a/k/a Jose Lima-Castro.
 

 [2]
 

 . La.C.Cr.P. art. 881.1;
 
 State v. Clark,
 
 05-61 (La.App. 5 Cir. 6/28/05), 909 So.2d 1007, 1017,
 
 writ denied,
 
 05-2119 (La.3/17/06), 925 So.2d 538.
 

 [3]
 

 .
 
 State v. Smith,
 
 01-2574 (La. 1/14/03), 839 So.2d 1, 4.
 

 [4]
 

 .
 
 Id.
 

 [5]
 

 .
 
 State v. Smith, supra,
 
 at 4.
 

 [6]
 

 .
 
 State v. Williams,
 
 03-3514 (La. 12/13/04), 893 So.2d 7, 16 (citing
 
 State v. Cook,
 
 95-2784 (La.5/31/96), 674 So.2d 957 [per curiam],
 
 cert. denied,
 
 519 U.S. 1043, 117 S.Ct. 615, 136 L.Ed.2d 539 (1996)).
 

 [7]
 

 .
 
 State v. Pearson,
 
 07-332 (La.App. 5 Cir. 12/27/07), 975 So.2d 646, 656.
 

 [8]
 

 .
 
 See, State v. Hensley,
 
 04-617 (La.App. 5 Cir. 3/1/05), 900 So.2d 1, 7,
 
 writ denied,
 
 05-0823 (La.6/17/05), 904 So.2d 683.
 

 [9]
 

 .
 
 See, State v. Smith,
 
 839 So.2d at 4;
 
 State v. Ragas,
 
 (La.App. 5 Cir. 5/15/07), 960 So.2d 266,
 
 writ denied,
 
 07-1440 (La. 1/7/08), 973 So.2d 732,
 
 cert. denied,
 
 - U.S. -, 129 S.Ct. 55, 172 L.Ed.2d 56 (2008).
 

 [10]
 

 .
 
 Miranda v. Arizona,
 
 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
 

 [11]
 

 . La. R.S. 15:451;
 
 State v. Harris,
 
 01-2730 (La. 1/19/05), 892 So.2d 1238, 1261,
 
 cert. denied,
 
 546 U.S. 848, 126 S.Ct. 102, 163 L.Ed.2d 116 (2005);
 
 State v. Gurganus,
 
 03-992 (La.App. 5 Cir. 12/30/03), 864 So.2d 771, 778,
 
 writ denied,
 
 04-0254 (La.6/4/04), 876 So.2d 75.
 

 [12]
 

 .
 
 Id.
 

 [13]
 

 .
 
 State v. Pugh,
 
 02-171 (La.App. 5 Cir. 10/16/02), 831 So.2d 341, 353.
 

 [14]
 

 .
 
 State v. Gregory,
 
 05-628 (La.App. 5 Cir. 3/28/06), 927 So.2d 479, 483.
 

 [15]
 

 .
 
 State v. Allen,
 
 06-778 (La.App. 5 Cir. 4/24/07), 955 So.2d 742, 753,
 
 writ denied,
 
 08-2432 (La. 1/30/09), 999 So.2d 754 (quoting
 
 Townsend v. Sain,
 
 372 U.S. 293, 83 S.Ct. 745, 754, 9 L.Ed.2d 770 (1963)).
 

 [16]
 

 .
 
 See,
 
 La.C.Cr.P. arts. 650, 651;
 
 State v. Phillips,
 
 05-1338 (La.App. 1 Cir. 3/29/06), 934 So.2d 162, 165.
 

 [17]
 

 .
 
 See, State v. Thomas,
 
 310 So.2d 517 (La. 1975);
 
 State v. Haley,
 
 353 So.2d 1011, 1013 (La. 1977);
 
 State v. Orange,
 
 02-0711 (La.App. 1 Cir. 4/11/03), 845 So.2d 570, 578,
 
 writ denied,
 
 03-1352 (La.5/21/04), 874 So.2d 161.
 

 [18]
 

 . 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985).
 

 [19]
 

 .
 
 Ake,
 
 470 U.S. at 83, 105 S.Ct. at 1096.
 

 [20]
 

 . 471 So.2d 707 (La. 1985).
 

 [21]
 

 .
 
 Id.
 
 at 709.
 

 [22]
 

 .
 
 State ex rel. McKnight v. State,
 
 98-2258 (La.App. 1 Cir. 12/3/98), 742 So.2d 894 [per curiam].
 

 [23]
 

 .State v. Graham,
 
 01-1232 (La.App. 5 Cir. 5/29/02), 820 So.2d 1101, 1106,
 
 writ denied,
 
 02-1770 (La. 12/19/02), 833 So.2d 329.
 

 [24]
 

 . See further discussion under Assignments of Error Nos. 17-20.
 

 [25]
 

 . La.C.Cr.P. art. 703(D).
 

 [26]
 

 .
 
 State
 
 v.
 
 Higgins,
 
 03-1980 (La.4/1/05), 898 So.2d 1219, 1232,
 
 cert. denied,
 
 546 U.S. 883, 126 S.Ct. 182, 163 L.Ed.2d 187 (2005).
 

 [27]
 

 .
 
 State v. Broadway,
 
 96-2659 (La. 10/19/99), 753 So.2d 801, 812,
 
 cert. denied,
 
 529 U.S. 1056, 120 S.Ct. 1562, 146 L.Ed.2d 466 (2000);
 
 State v. Peden,
 
 04-71 (La.App. 5 Cir. 5/26/04), 875 So.2d 934, 942.
 

 [28]
 

 .
 
 Manson v. Brathwaite,
 
 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977);
 
 State v. Evans,
 
 03-0752 (La.App. 5 Cir. 12/9/03), 864 So.2d 682, 695,
 
 writ denied,
 
 04-0080 (La.5/7/04), 872 So.2d 1079.
 

 [29]
 

 .
 
 State v. Jacobs,
 
 04-1219 (La.App. 5 Cir. 5/31/05), 904 So.2d 82, 87,
 
 writ denied,
 
 05-2072 (La.4/28/06), 927 So.2d 282,
 
 cert. denied,
 
 549 U.S. 956, 127 S.Ct. 385, 166 L.Ed.2d 276 (2006) (citing
 
 State v. Daughtery,
 
 563 So.2d 1171, 1174 (La.App. 1 Cir. 1990),
 
 writ denied,
 
 569 So.2d 980 (La. 1990)).
 

 [30]
 

 .
 
 See, Jacobs, supra.
 

 [31]
 

 .
 
 State v. Johnson,
 
 343 So.2d 155, 160 (La. 1977).
 

 [32]
 

 .
 
 Id.
 

 [33]
 

 .
 
 See also, State v. Jacobs,
 
 904 So.2d at 87.
 

 [34]
 

 .
 
 State v. Lopes,
 
 01-1383 (La.12/7/01), 805 So.2d 124, 128.
 

 [35]
 

 . La. C.E. art. 402.
 

 [36]
 

 . La. C.E. art. 403.
 

 [37]
 

 . La. C.E. art. 901;
 
 State v. Cosey,
 
 97-2020 (La. 11/28/00), 779 So.2d 675, 678,
 
 cert. denied,
 
 533 U.S. 907, 121 S.Ct. 2252, 150 L.Ed.2d 239 (2001).
 

 [38]
 

 .
 
 State v. Arita,
 
 04-39 (La.App. 5 Cir. 3/1/05), 900 So.2d 37, 43,
 
 writ denied,
 
 05-843 (La. 11/29/05), 916 So.2d 165.
 

 [39]
 

 .
 
 State v. Parks,
 
 07-655 (La.App. 5 Cir. 1/22/08), 977 So.2d 1015, 1027,
 
 writ denied,
 
 08-0495 (La.12/19/08), 996 So.2d 1126.
 

 [40]
 

 .
 
 Id.
 

 [41]
 

 .
 
 State v. Taylor,
 
 07-93 (La.App. 5 Cir. 11/27/07), 973 So.2d 83, 102,
 
 writ denied,
 
 07-2454 (La.5/9/08), 980 So.2d 688.
 

 [42]
 

 .
 
 State v. Hollins,
 
 99-278 (La.App. 5 Cir. 8/31/99), 742 So.2d 671, 681,
 
 writ denied,
 
 99-2853 (La. 1/5/02), 778 So.2d 587.
 

 [43]
 

 .
 
 Strickland v. Washington,
 
 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984);
 
 State v. Soler,
 
 93-1042 (La.App. 5 Cir. 4/26/94), 636 So.2d 1069, 1075,
 
 writs denied,
 
 94-1361 (La. 11/4/94), 644 So.2d 1055, 94-0475 (La.4/4/94), 637 So.2d 450.
 

 [44]
 

 .
 
 Strickland v. Washington,
 
 466 U.S. at 686, 104 S.Ct. at 2064.
 

 [45]
 

 .
 
 Strickland v. Washington,
 
 466 U.S. at 693, 104 S.Ct. at 2068;
 
 State v. Soler,
 
 636 So.2d at 1075.
 

 [46]
 

 . La. C.E. art. 801(C).
 

 [47]
 

 .
 
 See, State v. Broadway,
 
 753 So.2d at 809.
 

 [48]
 

 . La.C.Cr.P. art. 920;
 
 State v. Oliveaux,
 
 312 So.2d 337 (La. 1975);
 
 State v. Weiland,
 
 556 So.2d 175 (La.App. 5 Cir.1990).
 

 [49]
 

 .
 
 State v. Davenport,
 
 08-463 (La.App. 5 Cir.11/25/08), 2 So.3d 445, 451,
 
 writ denied,
 
 09-0158 (La.10/16/09), 19 So.3d 473.